## Levy *against* The President, Directors and Company of the Bank of the United States.

1802.

THIS cause was tried at Nisi Prius after *March* term 1802, before *Shippen* C. J. and *Smith* J. when the following facts appeared in evidence.

*Joseph Thomas* passed away to the plaintiff a check upon the Bank of the United States for $2600, dated the 31st *July* 1798, and purporting to be drawn by *Charles Wharton* in favour of *Joseph Thomas* or bearer. On the 3d of *August* 1798, between eleven and one o'clock, the check was presented at Bank by Mr. *Levy's* clerk; and was entered by the receiving teller to Mr. *Levy's* credit in his bank book as cash. It was also entered on the scratcher of the Bank, and in the *cash* book, and

*The entry of a check as cash, made by a Bank in the private bank book of the holder, is equivalent to payment; and if the check is a forgery, of which the holder was ignorant, the Bank must support the loss. It seems*

that the acceptor of a forged bill is bound to pay it, not upon the principle that his acceptance has given a credit to the bill, but because it is his duty to know the drawer's hand writing which he is precluded from disputing. If a forged check is credited as cash in the holder's bank book, and afterwards upon being informed of the forgery, and under a mistake of his rights he agrees that if the check is really a forgery it is no deposit, he is not bound by the agreement.

1802.

LEVY

v.

Bank U. S.

was credited to Mr. *Levy* and charged to *Charles Wharton*, according to the usage of that institution. On examining the checks of that day between three and four o'clock in the afternoon as was customary, this check was discovered to be a forgery; the credit to Mr. *Levy* in the cash book of the Bank, and the charge to Mr. *Wharton* were respectively struck out, and the entry in the scratcher left as it was. This was proved to be the usual mode of correcting such mistakes in the Bank. As soon as the discovery was made, one of the clerks of the Bank was sent to the plaintiff to request his own check in lieu of the other. The plaintiff asked the reason of this request, and was told by the clerk that *Charles Wharton* had not money enough in Bank, although the fact was otherwise. The plaintiff replied. " That is nothing to me." The clerk then told him the check was a forgery. The plaintiff was much surprised and said he would " take till the next day to consider of giving another " check in lieu of it." The clerk told him he might as well give it then, for although not authorized by the cashier, he was certain the plaintiff's check would not be received at Bank on that deposit. The plaintiff then made answer " On that score we " are perfectly agreed. If the check is a forgery, which is all I " wish to ascertain, it is no deposit." On the next day Mr. *Levy* told the Bank that he would not refund the money, and that he would not give them his bank book for the purpose of erasing the entry. He then drew a check on the Bank for $2600, the amount of this deposit (an undisputed balance having been previously paid to him) which was regularly protested for nonpayment, and this suit immediately instituted to recover the sum in question as money had and received and money lent and advanced. *Thomas's* forgeries, of which this was said to be one, were known by several persons on the 31st *July* and 1st *August*, but not generally disclosed until the afternoon of the 3d *August*, in the evening of which day he assigned his property for the benefit of his creditors, and absconded.

*M'Kean* (attorney general), *Dallas*, and *Ingersoll*, for the plaintiff; *Rawle* and *Lewis*, for the defendants.

For the plaintiff it was contended that his claim to a recovery of the money was good upon several grounds. 1st, The entry in his bank book was equivalent to an actual payment by the Bank, or to a deposit of cash: at all events it was an acceptance

.which made the Bank liable for the money. 2dly, The subsequent erasures by the Bank were wholly irregular, and as the act of one party, could have no effect upon the rights of the other. If the alteration could be made three hours after the entry, it could be made at any distance of time whatever. 3dly, The plaintiff's language proceeded from a misconception of his rights; it was not so deliberate an act as the law would construe into a renunciation of them.

1. The check was entered as a deposit of *cash* in the plaintiff's bank book. The uniform practice of the Bank and the universal understanding of its customers, shew that substantially there is not the smallest difference between such an entry founded upon a check, and one that is made for a deposit of specie. For the convenience of the institution and the dispatch of business, one clerk in this respect performs the office of two; and instead of receiving the money for the check and handing it over to be deposited and entered, the bearer finds both operations blended at one desk where the check is acknowledged to be cash, and treated as such by the entry. The entry is the same as a receipt for the cash. *Leach* 189. And if it was merely a transfer of so much money in the bank from the account of *Wharton* to that of the plaintiff, it was a payment. *Bolton* v. *Richard.* (a) The Bank having thus paid the check if it has turned out to be a forgery they must abide by the loss; and they cannot indirectly compel a repayment from us by withholding our deposit. The acceptor of a forged bill of exchange, who has paid it, cannot recover back the money from the bona fide holder; still less where it has been paid at once without any acceptance. *Price* v. *Neal.* (b) The law is the same where payment is made under a forged bond; the payer acts at his peril. *Allen* v. *Dundas.* (c)

But the result is still in the plaintiff's favour, if we consider this entry as an acceptance of the check, which in every material respect is an inland bill of exchange, and is declared upon as such. *Boehm* v. *Sterling.* (d) For by a series of cases, some of which are of long standing, and the rest of the highest modern authority, the acceptor of a forged bill of exchange is liable to the bona fide holder, whether the bill has been nego-

1802.

LEVY

v.

Bank U. S.

(a) 6 *D. & E.* 139.

(b) 3 *Burr.* 1355. 1 *W. Bl.* 390.

(c) 3 *D. & E.* 122.

(d) 7 *D. & E.* 430.

1802.

Levy

v.

Bank U. S.

tiated *after* acceptance or not; and upon this most reasonable principle that the acceptor is presumed and bound to know the drawer's hand writing, and to take that knowledge upon himself. In the case of *Jenys* v. *Fawler et al.* (a) which was an action by the indorsee of a bill against the acceptor, the defendant offered to prove it a forged bill by calling persons to swear that they did not believe it to be the drawer's hand writing. But Lord C. J. *Raymond* refused the evidence, and strongly inclined that even actual proof of forgery would not excuse the defendants against their own acceptance. So in *Price* v. *Neal*, Lord *Mansfield* said it was *incumbent upon the acceptor* to be satisfied that the bill drawn upon him *was the drawer's hand* before he accepted it. In *Smith* v. *Chester*. (b) *Buller* J. says " When a bill is presented for acceptance, the " acceptor only looks to the hand writing of the drawer, which " he is afterwards *precluded from disputing;* and it is *on that* " *account* that an acceptor is liable even though the bill be " forged;" and in *Master* v. *Miller*, (c) the same judge quotes this doctrine as having proceeded from an eminent and learned person in another place, " for half a century there have been " various cases which have left the question of forgery un- " touched. If a bill be forged, the acceptor is bound." " When " the drawee accepts a bill," says Lord *Kenyon* in *Jordaine* v. *Lashbroke*, (d) " he admits that the bill is signed by the per- " son by whom it professes to have been made;" and most inconvenient would it be if this admission were not enforced against the acceptor who is in a state of complete privity with the drawer as to the transaction upon which the bill is founded, and who has opportunities peculiarly his own of knowing the genuineness of the signature. It is indeed a question of *laches* between the holder and the acceptor. " If the " bill is not really drawn by the person whose name appears " upon it as the drawer, to whom is negligence or want of cau- " tion to be imputed? To the *acceptor* certainly. And therefore " if the bill be in fact forged, it is he who must sustain the loss." *Kyd on Bills* 204. It may be said that the ground upon which this liability of the acceptor has been maintained, is the credit which he has given to a negotiable instrument; and that the

(a) 2 *Stra.* 946.

(b) 1 *D. & E.* 655.

(c) 1 *D. & E.* 335.

(d) 7 *D. & E.* 604

principle of the various decisions is not met by the case before 1802.
the court, or by any case except that of a holder to whom the Levy
bill has been negotiated *after* acceptance. But although this v.
argument may be countenanced by the case of *Jenys* v. *Fawler*, Bank U. S.
where Lord *Raymond* appears to think forgery would be no
answer in the acceptor's mouth, because his acceptance " *had*
" *given the bill a credit to the indorsee*," yet the principle is put
on a very different ground by Lord *Mansfield*, Lord *Kenyon*,
and Justice *Buller;* the acceptor is liable because he is bound
to know the drawer's hand writing, and after his acceptance is
precluded from disputing it. The cases of *Price* v. *Neal*, and
*Smith* v. *Chester*, are decisive to this point. The Bank is
situated in this particular as though it had permitted a trans-
fer of its stock under a forged letter of attorney; a trustee
whether a private person or a body corporate must see to the
reality of the authority empowering them to dispose of the
trust money. *Ashby* v. *Blackwell.* (a)

2. The erasure was an act that by itself would subject the
books of an individual to just suspicion. It is manifestly an
irregular practice to erase entries which have been advisedly
made at the instance of third persons, and thus to attempt a
change of their rights. If an error of this kind existed it should
be corrected by a post entry which presents the whole matter in
an unmutilated form. But even if the erasure were legal it is
idle to say that the plaintiff's claim is destroyed by it. Is it un-
derstood in practice that the acts of the Bank are incomplete
until they have had time for investigation after bank hours?
Can it be pretended that after the entry in the bank book, some-
thing is wanting to complete the party's title to the money? On
the contrary it is notorious that he may draw for it the next
moment. The transaction was closed as it respects the plaintiff
at the instant of the entry; and most complex and inconvenient
would be the operations of a Bank, and fatal to its own interests,
if a different doctrine should prevail. Sending the clerk to de-
mand another check in lieu of the forgery is conclusive to shew
that they looked upon the erasures to be unavailing.

3. There is no bar then to the plaintiff's recovering but his
conversation with the clerk; and it would be indeed a rare inci-
dent in the administration of justice, if such a conversation pro-

(a) *Ambl.* 503.

ceeding from great and painful surprise should be construed into the deliberate renunciation of a right. It was however a conversation in which the clerk thought proper to use a dishonest artifice to procure the money from the plaintiff. He stated what was not the truth as to Mr. *Wharton's* account. His design was to entrap the plaintiff, and he has probably listened to his language with this improper view. But what were the expressions of Mr. *Levy?* Were they an opinion suddenly formed upon an imperfect consideration of the facts? This certainly was the case. And can it be pretended that it amounts to the release of a right, to an assent to every thing which the bank had done after the detection of the forgery? But if it amounts to a promise to repay the bank, it avails nothing under the circumstances of the case. It was made under a palpable mistake of the plaintiff's rights, and is not binding upon him. This is so evidently the law that in *Blesard* v. *Hirst,* (a) where the holder of an inland bill neglected to give notice of its nonacceptance to the drawers, and after the time of payment, which was also refused by the drawee, one of the drawers called at the holder's house in his way to *Leeds* and told him he would " take up the bill as he came back," but upon his return said he was advised that he was not bound to do it, it was held that the holder could not recover, and the promise by the drawer was not even noticed by the counsel, or in the opinion of the court. So in *Goodall* v. *Dolley,* (b) where there was an offer by the indorser of a bill similarly situated, to pay it by instalments, the court expressly decided that as it was made under an ignorance of all the circumstances, he was not bound. If money be paid under a mistake, which there is no ground to claim in conscience, it may be recovered back in an action for money had and received. *Bize* v. *Dickason.* (c) And in *Evans* v. *Llewellyn,* (d) even a conveyance, obtained from persons uninformed of their rights, though the master of the rolls thought the case before the court did not present any proof of actual fraud or imposition, was nevertheless set aside as *improvidently* entered into.

For the defendant, it was contended: 1. That the entry in the plaintiff's bank book did not amount to payment, and was clearly made by mistake. 2. That the acceptor of the bill, though indeed a check is not a bill, may upon the ground of forgery,

(a) 5 *Burr.* 2670.                    (c) 1 *D. & E.* 285.
(b) 1 *D. & E.* 712.                   (d) 2 *Bro. Ca.* 150.

resist payment to any one to whom the acceptance has not given
the bill a credit, or in other words where the bill is not nego-
tiated after acceptance. 3. That the plaintiff claimed through a
felony. 4. That the plaintiff's conversation amounted to a pro-
mise to refund, and prevented the bank from taking steps to
detain *Thomas*, whereby the money was lost.

1. The usage of the bank is presumed to be known to its
customers, and forms an ingredient in every transaction between
them. The Bank is known to examine every day the checks
which have been received during the hours of business, and to
correct by the kind of erasure given in evidence, the casual
misentries which have occurred. It is partly for the security of
the institution, but it is principally to do perfect justice; and
the whole time that elapses between the opening of the Bank
and the end of the examination is therefore but a point of time
in contemplation of the parties. The entry was subject to this
correction. It was a mere *transfer of credit*, which it is true is
the same as a receipt; but a receipt in full is no discharge if
given by mistake; and therefore that which is the strength of
the plaintiff's case in one particular is the overthrow of it in
another; for we claim the operation of all the authorities read
upon his last point, to resist his demand in the very threshold;
the entry was evidently a *mistake*. There is however a wide
difference between a transfer of credit, and a payment; for the
law is perfectly settled that if money be paid by mistake to the
agent of a third person, who passes it to the credit of his prin-
cipal against a debt which the principal owes him, and thus
closes the account, yet it is not a payment, but may be reco-
vered back in an action against the agent. *Buller* v. *Harri-
son.* (a) Nor is this principle opposed by the case of *Bolton*
v. *Richard;* for there the defendant gave the plaintiff a check
upon their common banker, requiring him to pay on demand a
certain sum in a bill at three months. The plaintiff did not take
a bill, but accepted a transfer of credit from the defendant's ac-
count to his own, and the banker failed before the check became
due. In an action against the drawer of the check upon the ori-
ginal demand, the transfer was held to be payment because the
plaintiff had obviously agreed to consider it as such. *Ashby* v.
*Blackwell* proceeded in some measure on the ground that the
Bank had deviated from their own rule with regard to the forged

(a) *Cowp.* 565.

1802.

LEVY

*v.*

Bank U. S.

power under which they suffered their stock to be transferred; for in *Hilyard* v. *The South Sea Company*, (a) Sir *J. Jekyl* held that the company was but a mere instrument or conduit pipe, and that it was the purchaser's concern to inquire into the letter of attorney.

2. But if this entry is considered to be an acceptance, still it is competent to the acceptor to deny the drawer's hand writing against every one but him to whom the bill has been negotiated after acceptance. All the cases which are so reported as to be worthy of credit, put it upon the ground that the acceptor has given a credit to the bill. In the leading case of *Jenys* v. *Fawler*, from *Strange*, Lord *Raymond* would not admit evidence to be given that the drawer's name was forged, *from the danger to negotiable notes;* and he inclined that actual proof of forgery would not excuse the defendants against their own acceptance, *which had given the bill a credit to the indorsee.* This was therefore the case of an indorsee *after* acceptance. That Lord *Raymond* limited this principle to the particular case is evident from *Wilkinson* v. *Lutwidge*, (b) decided by him in the prior reign, where, as between the acceptor and the plaintiff who was the holder *before* acceptance, he held that the former was not concluded from shewing the forgery; the acceptance being in his opinion merely presumptive evidence of the drawer's hand. *Price* v. *Neal* was also the case of an indorsee *after* acceptance, and therefore comes within the rule of *Jenys* v. *Fawler.* *Smith* v. *Chester* contains to this point only the dictum of judge *Buller*, and not delivered with reference to the distinction we take. When he repeats the same sentiment in *Master* v. *Miller* it is again his dictum; and in his general ideas in that case he was opposed by the whole court of King's Bench whose judgment was affirmed in error. It certainly may be true under some circumstances that " if a bill be forged the acceptor is " bound;" but wherever the question has been solemnly discussed the proposition is limited according to our argument; so that it is impossible for the plaintiff's counsel to bring any thing but dicta to their support, while the doctrine of the cases which are adverse to them has been adopted by more than one elementary writer; 3 *Woodeson* 115. *Kyd* 202.; and if instead of resorting to an arbitrary and in many cases an untrue position that the drawer's hand must be known to the acceptor and not to the

(a) 2 *P. Wms.* 76                    (b) *Stra.* 648.

holder, we adopt the reasonable and honest rule that so far as the acceptance has given the bill a credit the acceptor shall be bound, we introduce a harmony into the system which reconciles the cases with the dicta, and an equity which tempers the severity of the law in its operation upon an innocent person.

If the case is resolved into a question of laches, what comparison is there between the conduct of the plaintiff who held this check in his hands three days after it was due, and that of the bank whose clerk during the hurry of business entered it in the bank book? The most that can be said for the plaintiff is that he and the bank are in equal neglect, and then *melior est conditio possidentis.*

3. The plaintiff claims through a forgery. *Mead* v. *Young* (a) is decisive. There a bill was drawn payable to a certain *H. Davis* or order and came by accident into the hands of another *H. Davis.* While it was in his hands it was accepted and then indorsed by him to the plaintiff. Three of the judges were clearly of opinion that he could not recover from the acceptor, because he claimed through a forgery. The policy of the law compels the holder of the bill to pursue the perpetrator of the crime, who must be more within his reach than that of the acceptor.

4. The conversation of the plaintiff proceeded upon no mistake, as all the facts were fully communicated to him; it was a deliberate renunciation of his right if he possessed one. It moreover prevented the bank from making any exertion to arrest *Thomas*, who on the same evening absconded.

In reply it was said that the plaintiff does not claim through a forgery, but through the entry in the bank book. He does not make title through the bill, but they attempt to defeat his title by setting up the bill. There is no evidence that the bill was in the plaintiff's hands a day before he presented it; the date is no evidence of the fact; and if there was a delay it was for the interest of the bank.

Shippen C. J. delivered the following charge to the jury

This case depends partly upon law, and partly upon the facts which have been given in evidence to you; upon the former it is incumbent upon us to give you our sentiments. Several points of great importance have been made in the course of the argu-

(a) 4 D. & E. 28.

1802.

Levy
v.
Bank U. S.

1802.

LEVY
v.
Bank U. S.

ment, upon some of which the court have an opinion, and indeed no great doubts upon any of them. They will communicate enough to assist you in forming your verdict, and if any dissatisfaction is felt by the counsel, they can put the matter in train for revision. It is our opinion that when the check was credited to the plaintiff as cash, it was the same thing as if it had been paid; it is for the interest of the bank that it should be so taken. In the latter case the bank would have appeared as plaintiffs; and every mistake which could have been corrected in an action by them, may be corrected in this action, and none other. Now the law seems to be well settled that where a bill of exchange to which the drawer's name is forged has been paid by the drawee, it is too late for him to question the hand writing, and the loss must therefore fall upon him. The effect of an acceptance of a forged bill is not quite so clear. Some of the authorities decide that the acceptor is bound, because his acceptance gives a credit to the bill, and as it is very common to negotiate bills after acceptance, and indeed to procure their acceptance for the purpose of negotiating them, the reason of this rule may include the greatest number of the cases which occur. If the acceptor were liable for no other reason, this point would be in favour of the defendants, for the bank did not give the check a credit with the plaintiff. But the modern cases certainly notice another reason for this liability which we think has much good sense in it; namely, that the acceptor is presumed to know the drawer's hand writing, and by his acceptance to *take this knowledge upon himself*. In *Price* v. *Neal* it is said that it is incumbent upon the acceptor to be satisfied that the bill is the drawer's hand writing, before he accepts it; that is, it is his *duty;* and if he does not attend to it, it is a neglect for which he should suffer, and not the holder whose duty it is no where asserted to be. This rule would include the plaintiff's case. But as it is a point of much importance, it shall be reserved if the counsel request it. The delay of the plaintiff in presenting the check, even if it were proved, is of no importance between these parties. There are instances in which an indorsee holding a bill too long makes it his own; but it is for a reason which can never avail the acceptor or drawee. The drawer or indorser may lose by the delay, if their responsibility is held to continue; but it is for the advantage of the acceptor that the demand should be deferred, and he cannot sustain any injury by it. Whether the

Bank is entitled to a certain time for the purpose of examination, depends upon their mode of doing business with their customers, which is a matter of fact. It is impossible that they should be able to detect every forgery the instant it is presented; and they are clearly free from any laches in communicating the detection of this forgery to the plaintiff. But it is said the plaintiff has voluntarily renounced his right, by agreeing that it was no deposit if the check was a forgery. If he had said this deliberately, knowing his right, it might have been obligatory on him; but it was the expression of an opinion of what he should be obliged to allow, rather than of what he was willing to allow, and being under a mistake of his right he is not bound by it. The case of *Penn* and *Lord Baltimore* is decisive to this point. I was present at the argument half a century ago, and heard Lord *Hardwicke* say, though it is not mentioned in the printed report, that if *Lord Baltimore* made the agreement in question under a mistake of his right to another degree of latitude, he ought to be relieved; but that he was not mistaken. As some of the points however are of extensive commercial importance we will hear their merits examined in bank on a motion for a new trial, or otherwise if it is desired. In the mean time you will find such a verdict as the evidence and the law, as thus explained to you, will warrant.

Verdict for the Plaintiff.

1802.

LEVY
*v.*
Bank U. S.

A motion for a new trial was argued at *March* term 1803, by *Rawle* and *Lewis* for the defendants, and by *Ingersoll* for the plaintiff, upon the same points which were made at the trial; but the court stopped *Ingersoll* in his argument, and immediately discharged the rule, without assigning their reasons.