## Bayard *against* Shunk.

A payment in current bank notes discharges the debt, although, in consequence of the previous failure of the bank, of which both parties were ignorant, the notes were of no value at the time of payment.

ERROR to the Common Pleas of *Dauphin* county.

Henry M. Bayard against Christian Shunk and Joseph Bouman. Special verdict.

It is agreed by plaintiff and defendants, and by Samuel B. Hickox, as terre-tenant, that the following facts be stated as a special verdict for the opinion of the court, and either party shall have power to sue out a writ of error from the Supreme Court within ten days after judgment shall be rendered by the Court of Common Pleas. And for the purpose of trying the question, the judgment originally entered shall be considered as opened, and shall remain as a security in case of a judgment being rendered for the plaintiff on this case stated.

On the judgment above stated, the plaintiff sued out a *fi. fa.* No. 19, November term, 1840, which was delivered to the sheriff of Dauphin county on the 8th day of September 1840, by virtue of which, the said sheriff, on the same day, levied on a quantity of pig-iron, and a number of horses, wagons, &c., the property of Shunk and Bouman, the defendants, sufficient to have satisfied the plaintiff's debt. On the 25th day of September 1840, the defendants, Shunk and Bouman, made an agreement in writing of that date with Samuel B. Hickox, by which they agreed to sell and convey the Emiline Furnace estate, with all the personal property levied on as aforesaid, to the said Samuel B. Hickox, for the consideration therein mentioned. On the 26th day of September 1840, the said Shunk and Bouman executed and delivered to the said Samuel B. Hickox, a deed of conveyance for said Emiline Furnace and lands thereto attached. On the 14th day of October 1840, the said sheriff notified said Samuel B. Hickox, that he would advertise and sell the property levied on, if the debt of the plaintiff was not immediately paid; whereupon the said Samuel B. Hickox paid to John Fox, sheriff, the sum of $1004.93, in notes of the Commercial Bank of Millington, for which the said sheriff gave a receipt in the words following, viz :—

" *October* 14, 1840.

" Received of Samuel B. Hickox, the above sum of $1004.93, in full, for debt, interest, and costs on the above case.

  " Signed,          John Fox, *Sheriff.*"

Whereupon, the said sheriff gave up the property levied on as aforesaid, to the said Samuel B. Hickox, who appropriated the same to his own use. On the 15th day of October 1840, J. M. Forster, as attorney for the plaintiff, called upon the sheriff for the money, who offered the same notes to him in payment; and the said J. M. Forster received one of the said notes from the sheriff, and carried it to the office of the Bank of Pennsylvania at Harrisburg, and having returned to the office of the said sheriff, remarked to the sheriff that he had seen Mr Lesley, the cashier of the said bank, who told him that in the last Bicknell's Reporter, he had seen the said notes of the Commercial Bank of Millington were quoted at one-half of one per cent. discount; and the said sheriff then paid and delivered over to the said J. M. Forster, as attorney for plaintiff, the said notes, to the amount of nine hundred and ninety-five dollars and ninety-five cents, who, thereupon, gave a receipt in the following words, to wit:

" *October* 15, 1840.

" Received from John Fox, Esq., sheriff, the sum of nine hundred and ninety-two dollars principal, and three dollars and seventy-five cents interest, making in all nine hundred and ninety-five dollars and seventy-five cents, and three dollars and seventy-five cents attorney's fee.

" Jno. M. Forster, *Attorney.*"

On the same fifteenth day of October 1840, said J. M. Forster gave said notes to J. Lesley, Esq., to carry to Philadelphia, and be there exchanged for other money; and on the eighteenth day of October 1840, said J. Lesley returned from Philadelphia, and informed Mr Forster, the same day, that the Commercial Bank of Millington had stopped payment, and its notes " no sale." Mr Forster received the notes back again; and on the 19th day of October 1840, H. M. Bayard, the plaintiff, offered to return the said notes to the said Samuel B. Hickox, who declined receiving them. It is agreed that the said Commercial Bank of Millington stopped payment and failed on the thirteenth day of October 1840. The cashier of said bank left Millington on the twelfth day of October 1840, and has not since been heard of, and the notes of said bank are of no value. On the seventeenth day of November 1840, the plaintiff returned said notes to John Fox, the said sheriff, who, on the same day, offered to return them to the defendants, Shunk and Bouman, and to said S. B. Hickox, who severally refused to receive them; and on the same day the said sheriff made return of the said *fi. fa. prout.* the said return. On the said 15th October 1840, when J. M. Forster received said notes, and gave said receipt to said sheriff, the clerk of the sheriff entered on the back of the said *fi. fa.* the words " money made," and made the same entry in the sheriff's docket; but said entry on the

back of the writ was not signed by the sheriff, nor did he make any return of the said *fi. fa.*, or part with the possession of the same, till the said 17th November 1840, when first-mentioned return was made, and the writ filed. It is agreed that after the thirteenth day of October 1840, the notes of the Commercial Bank of Millington were of no value in Millington; that on the 16th October they were purchased by brokers at fifty per cent. in Baltimore, and that they passed current in Harrisburg before and up to the 19th day of October 1840.

If on the foregoing case the plaintiff, in the opinion of the court, is entitled to recover, judgment shall be entered for the plaintiff for the sum of nine hundred and ninety-five dollars and seventy-five cents, with interest from the said 14th day of October 1840. But if in their opinion the plaintiff is not entitled to recover, then judgment shall be entered for the defendants.

*Foster* and *M'Cormick*, for plaintiff in error,

Contended that that should not be considered as a payment which was of no value at the time. There can be no difference in principle between the case of the transfer of the note of an insolvent individual as payment and that of an insolvent bank; nor were the notes given in payment in this case any better than if they were counterfeit. In all the cases where the payment of bank notes has been considered as payment of money, the banks were solvent. And however much the notes may have been depreciated, if they were current and accepted as money, it would be payment; but in this case, where they are found to be utterly worthless, it cannot be considered as payment: 2 *Watts* 121; 1 *Penn. Rep.* 379; 14 *Serg. & Rawle* 54; 2 *Johns.* 458; 3 *Yeates* 531; 7 *Johns.* 458; 10 *Serg. & Rawle* 94; 6 *Dana* 336; 11 *Wend.* 1; 13 *Wend.* 101; 8 *Yerger* (*Ten. Rep.*) 175; 5 *Johns.* 68; 8 *Johns.* 389; 1 *Cow.* 290; 5 *Wend.* 490.

*Rawn* and *Attorney General Johnson*, for defendant in error,

Cited 6 *Mass.* 145; 1 *Johns.* 34; 10 *Johns.* 105; 10 *Mass.* 47; 11 *Mass.* 361; 6 *Mass.* 321; 11 *Johns.* 412; 6 *Mass.* 185; *Webs. Dic. Money;* 10 *Wheat.* 340; 4 *Dall.* 234; 1 *Binn.* 27; 14 *Serg. & Rawle* 56; 2 *Stark. Ev.* 596; *Chit. on Bills* 433; 8 *Yerger* 433; 13 *Eng. Com. Law Rep.* 201, 365; 1 *Cranch* 133.

The opinion of the Court was delivered by

Gibson, C. J.—Cases in which the bills or notes of a third party were transferred for a debt, are not to the purpose; and most of those which have been cited are of that stamp. Where the parties to such a transaction are silent in respect to the terms of it, the rules of interpretation are few and simple. If the securities are transferred for a debt contracted at the time, the presumption is that they are received in satisfaction of it; but if for a prece-

[Bayard v. Shunk.]

dent debt, it is that they are received as collateral security for it; and in either case it may be rebutted by direct or circumstantial evidence. But by the conventional rules of business, a transfer of bank notes, though they are of the same mould and obligation betwixt the original parties, is regulated by peculiar principles and stands on a different footing. They are lent by the banks as cash; they are paid away as cash; and the language of Lord Mansfield in *Miller* v. *Race* was not too strong when he said, " they are not goods, nor securities, nor documents for debts; but are treated as money, as cash, in the ordinary course and transaction of business by the general consent of mankind, which gives them the credit and currency of money to all intents and purposes; they are as much money as guineas themselves are, or any other coin that is used in common payments as money or cash." If such were their legal character in England, where there was but one bank, how emphatically must it be so here where they have supplanted coin for every purpose but that of small change, and where they have excluded it from circulation almost entirely. It is true, as was remarked in *Young* v. *Adams*, (6 *Mass.* 182) that our bank notes are private contracts without a public sanction, like that which gives operation to the lawful money of the country; but it is also true that they pass for cash, both here and in England, not by force of any such sanction, but by the legislation of general consent, induced by their great convenience, if not the absolute necessities of mankind. *Miller* v. *Race* is a leading case which has never been doubted in England or, except in a case presently to be noticed, in America; and it goes very far to rule the point before us; for if the wheel of commerce is to be stopped or turned backwards in order to repair accidents to it from impurities in the medium which keeps it in motion, except those which—few and far between—are occasioned by forgery, bank notes must cease to be a part of the currency, or the business of the world must stand still. The weight of authority bearing directly on the point, is decisively in favour of the position that *bona fide* payment in the notes of a broken bank discharges the debt. Though *Camidge* v. *Allenby* (6 *B. & C.* 373, *S. C.* 13 *Eng. Com. Law Rep.* 202) was not a case of payment in bank notes, but in the cash notes of a banker who had failed a few hours before, it was held that if they were to be considered as cash, the debt would be discharged; but if as negotiable paper merely, the holder was bound to use due diligence in procuring payment of them; and that in either aspect the same result was inevitable. Such notes, however, though formerly called goldsmiths' notes, have not been treated as cash by the merchants or the courts. Strictly speaking, they are ordinary promissory notes; for none but those of the Bank of England are considered bank notes in that country. The judges, however, seem to have hesitated as to their precise character in that case; but they distinctly decided that *bona*

*fide* payment in notes which have received the qualities of money from the conventional laws of trade, is absolute satisfaction notwithstanding the previous failure of the drawer. In America we have a decision directly to the point in *Scruggs* v. *Gass*, (8 *Yerger* 175) in which the Supreme Court of Tennessee held that payment in the notes of a bank which had failed, discharged the debt; and in *Young* v. *Adams*, already quoted, we have a decision of the Supreme Court of Massachusetts to the same purport.

In contrast with these stands *Lightbody* v. *The Ontario Bank*, decided by the Supreme Court of New York, (11 *Wendell* 1) and affirmed in the Court of Errors, (13 *Wendell* 101.) The judges and senator who delivered opinions in that case, seem not to have coincided in their intermediate positions, though they arrived at the same conclusion. The chief justice who delivered the opinion of the Supreme Court, appears to have thought that a bank note stands on the footing of any other promissory note; that as he who parts with what is valuable ought on principles of natural justice to receive value for it in return, a vendor is not bound by an agreement to accept promissory notes should they have been bad at the time of the transaction; and that payment in the notes of an insolvent bank is no better than payment in counterfeit coin. It is obvious that this involves a contradiction; for to confound bank notes with ordinary promissory notes would subject a debtor, who had paid them away, to the risk of the bank's ultimate solvency. In the Court of Errors, the chancellor, having premised that a state is not at liberty to coin money, or make any thing a legal tender but gold or silver, and consequently that the practice of receiving bank notes as money is a conventional regulation, and not a legal one, concluded that where the loss has already happened by the failure of the bank, there is no implied agreement that the receiver shall bear it; and that if he were called on to express his sense of the transaction at the time, he would say what natural justice says, that the risk of previous failure in the value of the medium must be borne by the debtor. He would more probably say that he had not thought or formed an opinion about it. Senator Van Schaik also insisted much on the natural justice of the principle, and asserted that no case in the books authorizes an inference that bank notes are considered as money except in the universally implied condition that the banks which issued them are able to redeem them at the time of the transfer. In *Miller* v. *Race*, however, we have seen that Lord Mansfield aserted on the other hand that they are money without any qualification whatever; and *Camidge* v. *Allenby*, as well as *Scruggs* v. *Gass*, affirms that they may retain the character of money after the period of the bank's failure. To assume that solvency of the bank at the time of the transfer is an inherent condition of it, is to assume the whole ground of the argument. The conclusion concurred in by all, however, was that the medi-

[Bayard v. Shunk.]

um must turn out to have been what the debtor offered it for at the time of the payment. How does that consist with the equitable principle that there must be, in every case, not only a motive for the interference of the law, but that it must be stronger than any to be found on the other side; else the equity being equal, and the balance inclining to neither side, things must be left to stand as they are, (*Fonb. B.* 1. *c.* v. § 3. ib. *ch.* iv. § 25) in other words, that the law interferes not to shift a loss from one innocent man to another equally innocent, and a stranger to the cause of it.

The self-evident justice of this would be proof, were it necessary, that it is a principle of the common law. But we need go no further in search of authority for it than *Miller* v. *Race*, in which one who had received a stolen bank note for a full consideration in the course of his business, was not compelled to restore it. It was intimated in *The Ontario Bank* v. *Lightbody*, that there was a preponderance of equity in that case, not on the side of him who had lost the note, but of him who had *last* given value for it. Why last? The maxim, *prior in tempore, potior in jure,* prevails between prior and subsequent purchasers indifferently of a legal or an equitable title. It is for that reason the owner of a stolen horse can reclaim him of a purchaser from the thief; and were not the field of commerce market overt for every thing which performs the office of money in it, the owner of a stolen note might follow it into the hands of a *bona fide* holder of it. But general convenience requires that he should not; and it was that principle, not any consideration of the equities betwixt the parties, which ruled the cause in *Miller* v. *Race*. But a more forcible illustration of the principle, were the case indisputably law, might be had in *Levy* v. *The Bank of the United States,* 4 *Dall.* 435; *S. C.* 1 *Binn.* 27; in which the placing even a forged check to the credit of a depositor as cash — a transaction really not within any principle of conventional law—was held to conclude the bank; and to this may be added the entire range of cases in which the purchaser of an article from a dealer, has been bound to bear a loss from a defect in the quality of it. And for the same reason that the law refuses to interfere between parties mutually innocent, it refuses to interfere between those who are mutually culpable; as in the case of an action for negligence. The rule of the admiralty, being that of the civil law, would apportion the loss; but it has no place in any other court.

What is there, then, in the case before us to take it out of this great principle of the common law? The position taken by the courts of New York is, that every one who parts with his property is entitled to expect the value of it in coin. Doubtless he is. He may exact payment in precious stones, if such is the bargain. But where he has accepted without reserve what the

[Bayard v. Shunk.]

conventional laws of the country declare to be cash, his claim to any thing further is at an end.  Bills of exchange and promissory notes enter not into the transactions of commerce, as money; but it impresses even these with qualities which do not belong to ordinary securities.  The holder of one of them, who has taken it in the ordinary course, can recover on it, whether there was a consideration between the original parties or not; and if no man can part with his property, except subject to an inherent right to have the worth of it, at all events, why should not the drawer of a note be at liberty to show want of consideration against an endorsee, on the ground that no one can pledge his responsibility without having received what he expected for it?  Or why, on the supposed moral and public considerations that were invoked in the discussion of the general principle, should the vendee of a chattel be bound to pay for it, though it turn out to be inferior in quality to what he expected it to be?  It is because it would stop the wheels of commerce to trace the defect through a series of transactions to the author of it; and dealers must therefore take the risk of it for the premium of the profits.  And may not dealers, as well as insurers, take the risk of an event which may have already happened?  The creditor does agree to take the risk of the bank's solvency when he makes its notes his own without reserve.

The assertion that it is always an original and subsisting part of the agreement that a bank note shall turn out to have been good when it was paid away, can be conceded no farther than regards its genuineness.  That genuine notes are supposed to be equal to coin, is disproved by daily experience, which shows that they circulate by the consent of whole communities at their nominal value when notoriously below it.  But why hold the payor responsible for a failure of the bank only when it has been ascertained at the time of the payment, and not for insolvency ending in an ascertained failure afterwards?  As the bank may have been actually insolvent before it chose to let the world know it, we must carry his responsibility back beyond the time when it ceased to redeem its notes, if we carry it back at all.  Were it not for the conventional principle that the purchaser of a chattel takes it with its defects, the purchaser of a horse with the seeds of a mortal disease in him might refuse to pay for him though his vigour and usefulness were yet unimpaired; and if we strip a payment in bank notes of the analogous cash principle, why not treat it as a nullity, by showing that the bank was actually, though not ostensibly, insolvent at the time of the transaction?  It is no answer to say the note of an unbroken bank may be instantly converted into coin by presenting it at the counter.  To do that may require a journey from Boston to New Orleans, or between places still further apart, and the bank may have stopped in the mean time; or it may stop at the instant of presentation when situated

[Bayard v. Shunk.]

at the place where the holder resides. And it may do so even when it is not insolvent at all, but perfectly able eventually to pay the last shilling. This distinction between previous and subsequent failure, evinced by stopping before the time of the transaction or after it, is an arbitrary and impracticable one. To such a payment we must apply the cash principle entire, or we must treat it as a transfer of negotiable paper, imposing on the transferree no more than the ordinary mercantile responsibility in regard to presentation and notice of dishonour. There is no middle ground. But to treat a bank note as an ordinary promissory note, would introduce endless confusion, and a most distressing state of litigation. We should have reclamations through hundreds of hands, and the inconvenience of having a chain of disputes between successive receivers, would more than counterbalance the good to be done by hindering a crafty man from putting off his worthless note to an unsuspecting creditor. No contrivance can prevent the accomplishment of fraud, and rules devised for the suppression of petty mischiefs have usually introduced greater ones.

The case of a counterfeit bank note is entirely different. The laws of trade extend to it only to prohibit the circulation of it. They leave it in all beside to what is the rule both of the common and the civil law, which requires a thing parted with for a price to have an actual, or at least a potential existence (2 *Kent* 468), and a forged note, destitute as it is of the quality of legitimate being, is a *nonentity*. It is no more a bank note than a dead horse is a living one; and it is an elementary principle that what has no existence cannot be the subject of a contract. But it cannot be said that the genuine note of an insolvent bank has not an actual and a legitimate existence, though it be little worth; or that the receiver of it has not got the thing he expected. It ceases not to be genuine by the bank's insolvency; its legal obligation as a contract is undissolved; and it remains a promise to pay, though the promisor's ability to perform it be impaired or destroyed. But as the stockholders of a broken bank are the last to be paid, it is seldom unable in the end to pay its note-holders and depositors; and even where nothing is left for them, its notes may be parted with at a moderate discount to those who are indebted to it. We seldom meet with so bad a case as the present, in which every thing like effects, and even the vestiges of the bank, disappeared in a few hours after the first symptoms of its failure. But independent of that, the difference between forgery and insolvency in relation to the transfer of a bank note, is as distinctly marked as the difference between title and quality in relation to the sale of a chattel.

What, then, becomes of the boasted principle that a man shall not have parted with his property until he shall have had value, or rather what he expected for it? Like many others of the same

school, it would be too refined for our times, even did a semblance of natural justice lie at the root of it.    But nothing devised by human sagacity can do equal and exact justice in the apprehension of all men.    The best that can be done, in any case, is no more than an approximation to it; and when the incidental risks of a business are so disposed of as to consist with the general convenience, no injustice will in the end be done to those by whom they are borne.    Commerce is a system of dealing in which risk, as well as labour and capital, is to be compensated.    But nothing can be more exactly balanced than the equities of parties to a payment in regard to the risk of the medium when its worthlessness was unsuspected by either of them.    The difference between them is not the tithe of a hair, or any other infinitesimal quantity that can be imagined; and in such a case, the common law allows a loss from mutual mistake to rest where it has fallen, rather than to remove it from the shoulders of one innocent man to the shoulders of another equally so.    The civil law principle of equality, however practicable in an age when the operations of commerce were few, simple, and circumspect, would be entirely unfit for the rapid transactions of modern times : it would put a stop to them altogether.    No man can withhold his praise of the civil law, as a wonderful fabric of wisdom for its day, or deny that it has contributed largely to the best parts of our jurisprudence; but all its materials of superior value have already been worked up in our more commodious modern edifice; and if the cultivation of an acquaintance with it is to beget a desire to substitute its abstract principles for the maxims of the common law—the accumulated wisdom of a thousand years' experience—it were better that our jurists should die innocent of a knowledge of it.    This longing after its peculiar doctrines began with Mr Verplank's commentary on the decision of the Supreme Court of the United States in *Laidlaw* v. *Organ*, 2 *Wheat.* 178 ; and it was subsequently indulged by the Supreme Court of his own state so far as to sap the foundation of its own sound decision in *Seixas* v. *Wood*, 2 *Caine's Rep.* 48.    In *Laidlaw* v. *Organ*, the purchaser refused to disclose his information that the article had risen in the market, and there was therefore room for a pretence of inequality in the circumstances of the parties ; but where they have acted as in this case, in equal ignorance, and with equal good faith, that pretence, flimsy as it was even there, is wanting, and the law on principles of justice, as well as convenience, refuses to interfere between them.    It is therefore unnecessary to insist on the provisions of our statute of 1836, which enacts that " it shall be lawful for the officer charged with the execution of any writ of *fieri facias*, when he can find no other real or personal estate of the defendant, to seize and take the amount to be levied by such writ, of any current gold, silver, or copper coin belonging to the defendant, in satisfaction thereof; or he may take

the amount aforesaid of any bank notes, or current bills for the payment of money, issued by any moneyed corporation, at the par value of such notes.'' At least for the purpose of seizure in execution, therefore, bank notes are money; and had the sheriff returned that he had seized these notes as the defendant's property, instead of the property itself, it would not be pretended that the debt was undischarged. But though he returned the facts specially, the notes were received as cash by the plaintiff's attorney; and after that, on no principle whatever could the transaction be thrown open. The plaintiff's case is an unfortunate one, but we could not relieve him without imposing an equal misfortune on the defendants.

Judgment affirmed.